# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

     Plaintiff,

     v.                                 Case No. 04-CR-117

CAROL A. GRAHAM a/k/a CAROL GRAHAM-HAYES
and ELIJAH HAYES,

     Defendants.

# RECOMMENDATION TO
# UNITED STATES DISTRICT JUDGE J.P. STADTMUELLER

## NATURE OF THE CASE

The defendants, Carol A. Graham-Hayes (Graham-Hayes) and Elijah Hayes (Hayes), are charged in a six-count indictment filed on May 18, 2004. The defendants are charged in Count One with conspiring to violate 18 U.S.C. § 1344(1) by executing a scheme to obtain money and other things of value from federally insured financial institutions through materially false and fraudulent pretenses, representations and promises. Count Four charges both defendants with the knowing possession of 15 or more credit card account numbers that had been stolen and obtained with intent to defraud, in violation of 18 U.S.C. § 1029(a)(3). Both defendants also are charged in Count Five with knowingly and with intent to defraud, using unauthorized credit card account numbers that had been stolen and obtained by the defendant with intent to defraud in violation of 18 U.S.C. § 1029(a)(2).

Count Six charges defendant Graham-Hayes with knowingly making, uttering, and possessing a counterfeit security of an organization with the intent to deceive in violation of 18 U.S.C. § 513(a). Defendant Hayes is charged in Count Two with falsely representing a

social security number that he knew was not assigned to him by the Commissioner of Social Security for the purposes of opening a bank account in violation of 42 U.S.C. § 408(a)(7)(B). Count Three charges that defendant Hayes, for purposes of obtaining an instruction permit from the Wisconsin Division of Motor Vehicles, falsely represented a social security number that he knew was not assigned to him by the Commissioner of Social Security in violation of 42 U.S.C. § 408(a)(7)(B).

On June 25, 2004, defendant Hayes appeared for an arraignment and entered a plea of not guilty. Defendant Graham-Hayes entered a not guilty plea at her arraignment on July 22, 2004. Pursuant to the pretrial scheduling order issued at that time, the defendants filed various motions, some of which have already been addressed.

The following motions filed by defendant Hayes are currently pending: 1) motion to suppress (Docket #72); and 2) motion to dismiss the indictment (Docket #116). Defendant Graham-Hayes has filed the following motions which are pending: 1) motion to suppress the fruits of the search of her California home on March 12, 2003 (Docket # 78); and 2) motion to suppress the fruits of the search of her Milwaukee home on July 10, 2002. (Docket #77)

The defendants' motions to suppress will be addressed herein. The remaining motion will be addressed in a separate decision.

On April 14 and 15, 2005, the court conducted an evidentiary hearing on the defendants' motions to suppress. The hearing was continued to April 27, 2005. The following witnesses testified on behalf of the government: Deputy United States Marshal Douglas Bachert, United States Postal Clerk John T. Simpkins, and Postal Inspector Vicki D. Lenard. Testifying for defendant Hayes were Rufus Lee Smith, Manager of Distribution Operations for the United States Postal Service, and Postal Inspector Shawn Tiller. Postal Inspector Lenard also was called as a witness by defendant Hayes. At the continued hearing, United States

Case 2:04-cr-00117-JPS   Filed 06/21/05   Page 2 of 28   Document 158

Deputy Marshal Wayne Ellinghauser was called as a witness by defendant Graham-Hayes. Based upon the testimony and evidence adduced at the hearing, the court makes the following findings of fact and recommendation for the proposed disposition of the defendants' motions to suppress.

## FINDINGS OF FACT

In April 2002, a warrant was issued for the arrest of defendant Hayes for an alleged probation violation. In May 2002, Deputy United States Marshal Douglas Bachert began to work on the case, along with Milwaukee Police Department Detective Paul Bratonja. Both men were members of the Fugitive Drug Task Force. Previously, Deputy United States Marshal Wayne Ellinghauser had worked on the case.

During the course of his investigation, Deputy Bachert spoke with Inez Whatley. She told Deputy Bachert that she and her husband knew defendant Hayes and that he would be in contact with his wife, Carol.

As part of his investigation, Deputy Bachert had a copy of a Personal History of Absconder form completed by the United States Probation Office. This form gives the best information to locate an absconder and includes significant factors such as a defendant's last known address, his associates, relevant telephone numbers, and charges. After reviewing the information on the form and speaking to United States Probation Officer Rex Morgan, Deputy Bachert was aware that defendant Hayes' address was 4947 North 47th Street, apartment #2, Milwaukee, Wisconsin, and that defendant Hayes had no car and no employment. Probation Officer Morgan told Deputy Bachert that defendant Hayes would most likely be at the residence. The neighborhood around the residence at 4947 North 47th Street was not canvassed by Deputy Bachert, nor was he aware of any other law enforcement officer talking to people in the neighborhood.

On May 29, 2002, at about 10 a.m., Deputy Bachert went to defendant Hayes' residence to execute a fugitive warrant. All the shades were drawn. At the time he went to defendant Hayes' residence, Deputy Bachert expected defendant Hayes to be there based on the information he had. When he received no response to his knock on the door to apartment #2, Deputy Bachert spoke to Willie Page, the caretaker of the four-unit building. Mr. Page resided in apartment #1. This was the first day that Deputy Bachert had contact with Mr. Page.

Deputy Bachert told Mr. Page that there was a warrant for defendant Hayes' arrest. Mr. Page did not know where defendant Hayes might be, but he confirmed that defendant Hayes did not have a vehicle. Mr. Page did not remember seeing the defendant that day. At that time, there was no indication that defendant Hayes had left town since he had no vehicle, and his wife reportedly had been seen in the apartment within the prior few weeks.

Mr. Page told Deputy Bachert that he recognized the photograph of defendant Hayes and that he was the husband of Carol Graham-Hayes who also lived in the apartment. Mr. Page said he had seen the defendant frequently, but he could not give Deputy Bachert a specific date when he last saw defendant Hayes. Deputy Bachert asked Mr. Page for the key to the defendants' apartment because he wanted to enter the residence to do a security sweep to see if defendant Hayes was in the residence and he did not want to damage the apartment door. Deputy Bachert obtained a key from Mr. Page. Deputy Bachert did not recall Mr. Page calling anyone prior to giving Deputy Bachert the key. He believed Mr. Page retrieved the key from his residence.

Deputy Bachert opened the door with the key and went inside the residence. Deputy Bachert looked anywhere a body could be found, including under the bed and in closets. While he was in the residence, he observed identification cards and names with social

- 4 -

security numbers on a table next to a computer. Deputy Bachert did not open any file cabinets or drawers and he did not pick up or handle any of the employment cards or social security cards. After about five to ten minutes inside the residence, he left the apartment and returned the key to Mr. Page.

Deputy Bachert stated that it was his understanding that Deputy Ellinghauser had spoken to defendant Graham-Hayes previously and that she had said she had not seen the defendant for some time. According to Deputy Bachert, this statement was in conflict with information obtained from Mr. Page who stated that he had seen defendant Hayes the week before and that he had seen him at the apartment several times over the past several months. He also said that the defendant came and went at odd hours.

Deputy Ellinghauser did not recall interviewing either defendant Graham-Hayes or Mr. Page. He was involved in the search of defendant Hayes' residence, but did not canvas Defendant Hayes' neighborhood or tell the neighbors that defendant Hayes was wanted for bank robbery. As part of his role in the investigation, he developed some information about the credit cards which were being used.

The next time that Deputy Bachert went to defendant Hayes' residence was on July 10, 2002, when he participated in the execution of a document search warrant for records and other information which would assist him in locating defendant Hayes. Various records, including telephone bills, envelopes with credit information and notes were taken from the residence, along with a computer. The property was turned over to the Milwaukee County Sheriff's Department because the documents appeared to be Milwaukee County documents. At the time, Deputy Bachert was aware that defendant Graham-Hayes was employed at the Milwaukee County Register of Deeds Office.

Subsequent to the search, defendant Graham-Hayes became a fugitive and a warrant was issued for her. Deputy Bachert was not aware of any surveillance that had been conducted at defendant Hayes' house. He did not speak with defendant Graham-Hayes' parole officer.

Deputy Bachert spoke to Tony Day, an employee at Bank One, who sent him a fax dated March 4, 2003. Mr. Day advised Deputy Bachert by telephone that a Bank One client had contacted him and said that he thought he was the victim of identity theft. When he received the fax, Deputy Bachert contacted Secret Service Agent Angela Sheldon.

John Simpkins testified that he has been employed by the United States Postal Service for over 26 years and has worked as a parcel post clerk for the past five years. His responsibilities include the processing of priority mail. He explained that the mail goes up a conveyor belt at the distribution center and that he observes the mail to make sure that it has the right postage and that it is priority mail. He only processes priority mail. A priority mail package is red, white and blue.

On March 10, 2003, he was working his normal shift from 4:00 p.m. to 12:00 a.m. when he noticed a package at the top of the conveyor belt which was not in a priority-mail package. The package was approximately 8½ by 11 inches in size. He could not see if the package was open at that time. However, when the package dropped to the next conveyor belt, he observed three cards come out of the package. About one-half of the top part of the package was open. He observed two social security cards which had no numbers. The two cards were facing up and were a few inches behind the package. The third card was under the package face down.

Mr. Simpkins tried to put the cards back in the package, but then he thought that something was wrong with the package. He observed that the return address was not the

Social Security Administration.  He also observed that the postage was not the right postage for priority mail.  The package had only seven $0.37 stamps on it and the stamps were not cancelled.  Mr. Simpkins also observed that the contents in the package were not evenly placed and that the package was heavy and unbalanced.

According to distribution center policy, employees are to attempt to repair any opened package so it can be mailed to its destination in a timely fashion.  As he tried to replace the cards in the package, he observed two identification cards that were almost out of the package which contained pictures of the same woman but with different addresses.  See Exhibits 17(C) and 17(D).  He also observed an approximately 8" by 10" sheet of paper which was also almost coming out of the package.  The sheet of paper had numbers on it which Mr. Simpkins thought looked like social security numbers.  He did not see a folder with envelopes inside the package.

Mr. Simpkins did not look inside the package.  He looked at the edge of the package only and the contents that he observed coming out of it.  Mr. Simpkins did not see a green sticker on the package and he did not know about the importance of the green sticker.  Mr. Simpkins noted, based on his experience, that the package weighed about one pound or more.

Mr. Simpkins had attended a safety talk on identity theft the week before he observed the open package.  He was also aware that March was identify fraud month at the United States Postal Service.

After he observed the open package at about 6:30 p.m., Mr. Simpkins contacted his supervisor, Albert Winbush, and explained what had occurred and what he had observed. He gave the package to his supervisor and said: "[y]ou need to call the postal inspector, this

is identity theft." (Tr. 66). His supervisor then said he would give the package to Rufus Smith, the manager of distribution operations.

Mr. Simpkins explained that mail with uncancelled stamps cannot be sent out because the stamps can be used again. Therefore, the stamps have to be cancelled for revenue protection. According to Mr. Simpkins, the package in Exhibit 6 appeared to be in the same condition as when he saw it. It had a few dirt spots on it.

Rufus Smith, manager of distribution operations at the Marina Processing and Distribution Center, received the package from Mr. Simpkins. At that time, Mr. Smith worked the 3:00 p.m. to midnight shift at the facility. When Mr. Simpkins placed the package on Mr. Smith's desk, Mr. Smith observed a portion of an 8½" by 11" sheet of paper with numbers and names on it and one or two social security cards which were partially exposed and on top of the paper. The sheet of paper extended out of the package by about three inches. The social security cards were on top of the paper. Mr. Smith did not look inside the package.

Postal Inspector, Vicki D. Lenard, whose maiden name is Vicki D. Morgan, was working at the Alameda domicile in Los Angeles on March 10, 2003, as a member of the Economic Crimes Team. The team investigates credit card and bank fraud and identity theft. Shawn Tiller was her supervisor in March 2003. At that time, he worked from 8:00 a.m. to 6:00 p.m.

On March 10, 2003, sometime before 6:00 p.m., Inspector Tiller contacted Inspector Lenard and told her that Mr. Smith, manager of distribution operations at the Marina Processing and Distribution Center, had contacted him and reported that blank social security cards and a piece of paper with what appeared to be credit card numbers and two identification cards with photographs of the same woman but with difference addresses had fallen out of a package at the plant. Inspector Lenard could not recall the precise time that she received the telephone call, but said that in all likelihood it was before 5:00 p.m.. She

works 10 hour days and sometimes came in early so that she can leave about 3:00 to 4:00 p.m. to avoid the rush hour. The Marina Processing and Distribution Center is a huge mail processing plant which sorts mail for three zip code areas surrounding Los Angeles. It handles four to five million pieces of mail a day, depending on the day of the week.

At the time she was told to retrieve the package, Inspector Lenard had no knowledge of any criminal activity involving the package. She did not know of the defendants and did not know Deputy Marshal Douglas Bachert or Secret Service Agent Angela Sheldon.

On the morning of March 11, 2003, Inspector Lenard drove from her residence and retrieved the package from the mail processing center. Her office is approximately 20 miles from the mail processing plant. Inspector Lenard contacted the receptionist at the processing center who retrieved the package for her. Inspector Lenard did not have access to the mail processing plant. When she retrieved the package, it was torn across the top and had a tear in the corner. The package was approximately two inches thick and was "crammed full of documents." (Tr. 118). The package was torn on the bottom when she received it from the mail processing center.

When she picked up the bulging package on both sides, Inspector Lenard could see a white sheet of paper with handwritten numbers on it which, based on her training and experience, she recognized as credit card numbers. See Exhibit 17(B). Inspector Lenard did not open the package when she received it. She did not know from where the package was mailed. Neither Inspector Lenard nor Inspector Tiller tried to interview the person who found the package. However, Inspector Lenard subsequently found Mr. Simpkins' name on a handwritten note in a file.

Postal Inspector Lenard took the package back to her office in downtown Los Angeles, removed the contents, and photocopied all the items. Two of the fraudulent identification

- 9 -

cards in the mailed package had defendant Graham-Hayes' photograph on them. Personal items were found with the contraband in the package.

Inspector Lenard contacted the United States Attorney's Office to obtain an anticipatory search warrant. She prepared the affidavit for the search warrant. In her affidavit, she stated that Mr. Smith had contacted the postal inspectors and advised that a package had broken open in the mail stream and that social security cards, identification cards, and credit card numbers had come out of the package. She also checked with an individual whose credit card number was on the list to confirm that he had not authorized his credit card number to be sent to Gregory Flood at the Courtland Street address.

Inspector Lenard also checked the Lynwood, California, address on the package via AutoTrack. Her search revealed that the only person found to be residing at the address was Gertie B. White. Before she completed the search warrant affidavit, Inspector Lenard also called some of the victims to verify that whoever had the access devices was not authorized to be in possession of those access devices.

Because the package was so damaged, Inspector Lenard had to repackage it. She then turned over the photocopies of the contents of the package to Inspector Tiller. Inspector Tiller went out to get a description of the Courtland Street address and to take photographs. The postal inspectors also contacted the letter carrier in the area, Laura Ramos, who advised that she was not the regular letter carrier, but that when she went to the address at 3864 Courtland Street, a black male came to the door and asked if she had any mail for him.

After the search warrant affidavit was drafted and the anticipatory warrant obtained, the plan was for Postal Inspector Kim Gordon, who would be operating in an undercover capacity, to deliver the package containing the documents from the original package.

Inspector Tiller made up the duplicate control package, although he did not recall stuffing the envelope. He wrote the address on the package to resemble the original package.

Before the search warrant was executed, surveillance observed a black female come out the front door and go back into the residence. Postal Inspector Shari Delaney was in the back of a Jeep Cherokee with a videotape maintaining surveillance on Postal Inspector Gordon at all times. Inspector Gordon delivered the package to the residence. A black male opened the door and she had a brief discussion with him about the various stickers on the outside of the package. She gave the black male the package.

At approximately noon, the search warrant was executed. The individuals executing the warrant were wearing bulletproof vests marked with the wording: "Police Postal Inspectors." By the time Postal Inspector Lenard entered the residence, defendant Hayes was on the floor. At that time, Inspector Lenard observed someone run past the side window of the residence. She went out the back door and ultimately found defendant Graham-Hayes caught on the spokes of a tall iron fence in the backyard area. Defendant Graham-Hayes was brought back to the residence.

Pursuant to the procedure utilized in the Court of Appeals for the Ninth Circuit, photographs were taken of the residence upon securing its occupants. The law enforcement officials tried to put everything back in the appropriate place. While they were in the residence, the postal inspectors observed identification cards on a coffee table, but they did not see the blue folder with the other documents. Upon further searching, a black and yellow nylon bag was found inside a washing machine with the blue folder and documents inside. Additionally, a black bag, which was believed to belong to defendant Hayes, was discovered in the back bedroom. It contained his military discharge record and the marriage certificate

- 11 -

of defendants Elijah Hayes and Carol Graham-Hayes. The search of the residence lasted until late afternoon.

The defendants refused to provide information such as their names or addresses to the postal inspectors. The paramedics were called because defendant Graham-Hayes had sustained an injury when she was stuck on the iron post. She refused to give her name to the paramedics. The defendants were brought to the postal inspectors' office and booked as John Doe and Jane Doe. They then were fingerprinted and photographed.

The defendants continued to be uncooperative and the fingerprints that were obtained were somewhat smudged. The Federal Bureau of Investigation (FBI) was unable to make a fingerprint match because of the quality of the fingerprints. Another postal inspector, who was more familiar with the criminal history computer, obtained the FBI numbers of the defendants, which then were used to establish their identities. Postal Inspector Lenard learned that defendant Hayes was a fugitive with a prior armed bank robbery conviction. She also found out that defendant Hayes had used aliases, including Gregory Flood, the name listed on the package.

Although the search warrant did not list a computer to be seized, the postal inspectors saw a computer at the residence which appeared to be used in the criminal activity. Because they believed it was evidence of a crime, they seized the computer. A separate search warrant was obtained before the computer was searched.

After the execution of the search warrant, in addition to contacting victims whose access numbers were listed in the package, Postal Inspector Lenard spoke to people whose employment applications were obtained from the residence in Lynwood, California. She also spoke to Ms. White who said that Gregory Flood was staying at her house, but she did not know the female who supposedly was staying there. Ms. White is defendant Hayes' sister.

She said that defendant Hayes had told her that he had legally changed his name to Gregory Flood. Inspector Lenard did not talk to any postal inspectors in Memphis, Tennessee.

Rufus Lee Smith, the manager of distribution operations at the United States Postal Service in Marina Del Ray, was responsible for managing supervisors at the postal plant. On March 10, 2003, Mr. Simpkins brought a package to his office which he said might contain illegal documents. All the documents were in the envelope when Mr. Simpkins brought it to Mr. Smith, although several social security cards and a white sheet of paper were partially out of the envelope. Mr. Smith did not recall when Mr. Simpkins brought the package to him, although he noted that he was working the 3:00 p.m. to midnight shift at the time.

Mr. Smith called the postal inspectors and said that he had a suspicious package that could be of interest to them. In December 2004, he was under the assumption that a temporary employee had found the package, not Mr. Simpkins.

Mr. Smith said that the package should not have ended up in California because it was overweight and the stamps on the package had not been cancelled. He explained that the green sticker on the package was in compliance with aviation security procedures. He also testified that there was no way to determine where a package came from if it was not metered. He had no idea how long the package had been in the mail before it got to Mr. Simpkins.

Mr. Smith explained that when a package is open, an employee is to repair the package if possible and get it back in the mail stream. A postal employee can only look in the package if a loose piece is out and he is trying to put it back into the package. He emphasized that postal employees are not authorized to open mail. Mr. Smith never looked in the package; he only looked at the items that were exposed.

## Analysis

Defendant Hayes has moved to suppress items seized from the premises at 4947 North 47th Street, apartment #2, Milwaukee, Wisconsin, on the ground that the search was conducted in violation of the Fourth Amendment to the United States Constitution. (Docket #72). He challenges the United States Marshal Service's entry into the residence in late May 2002, without a warrant and the subsequent July 10, 2002, search with a warrant. With respect to the search of the California residence, defendant Hayes questions the opening of the envelope at the United States Postal Service distribution center and the subsequent search warrant which was issued based in part on the contents of the envelope and was executed at the California home.

Defendant Graham-Hayes has moved to suppress the search of the California home on March 12, 2003, based upon defects in, and the illegally obtained evidence supporting, the search warrant. She asserts that the warrant was based almost entirely on information derived from the envelope which came open while in the custody of the Postal Service. She contends that the postal employees "observations of the contents and the subsequent inspection of the contents violated her right [against] unreasonable searches and seizures and therefore were invalid to support the search warrant for the search of her home." (Carol Graham's Motion to Suppress the Fruits of the Search of her California Home on March 12, 2003 at 1-2).

At the outset, the government contends that defendant Graham-Hayes lacks standing to challenge the discovery of items that were accidentally opened in processing at the California postal facility. The items lead to a search of the defendants' home in California.

Defendant Graham-Hayes asserts that she has standing to challenge the search, citing United States v. Koenig, 856 F.2d 843 (7th Cir. 1988). She states that the package contained

identification cards with her photograph and her last address in Milwaukee County. Therefore, she maintains that the "contents of the package were intended not only for Elijah Hayes but also for Carol Graham." (Defendant Graham-Hayes' Post-Hearing Brief in Support of Motion to Suppress at 3).

"Fourth Amendment rights are personal rights which, like some other constitutional rights, may not be vicariously asserted." Rakas v. Illinois, 439 U.S. 128, 133-34 (1978), reh'g denied, 439 U.S. 1122 (1979). "[R]ights assured by the Fourth Amendment are personal rights, [which] . . . may be enforced by exclusion of evidence only at the instance of one whose own protection was infringed by the search and seizure." Id. at 138. Thus, the question is whether the challenged search or seizure infringed an interest of the defendant which the Fourth Amendment was designed to protect. Id. at 140.

A defendant's Fourth Amendment rights are violated only when the challenged conduct invades the party's legitimate expectation of privacy rather than that of a third party. United States v. Payner, 447 U.S. 727, 731, reh'g denied 448 U.S. 911 (1980); United States v. Williams, 737 F.2d 594, 616 (7th Cir. 1984). A person asserting a legitimate expectation of privacy in the object of a search must establish two elements: 1) the person must manifest a subjective expectation of privacy in the object, and 2) society must be willing to recognize that expectation as legitimate. California v. Ciraolo, 476 U.S. 207, 211 (1986).

A defendant seeking to suppress evidence has the burden of establishing a legitimate expectation of privacy. United States v. Ruth, 65 F.3d 599, 605 (7th Cir. 1995); United States v. Peters, 791 F.2d 1270, 1281 (7th Cir.1986). Thus, the "proponent of a motion to suppress has the burden of establishing that his own Fourth Amendment rights were violated by the challenged search or seizure." Rakas, 439 U.S. at 131, n.1.

- 15 -

Sealed mail historically has been considered to have a high degree of privacy and is entitled to Fourth Amendment protection against warrantless searches and seizures just as any other private area.  United States v. Jacobsen, 466 U.S. 109, 114 (1984); United States v. Van Leeuwen, 397 U.S. 249, 251 (1970); Ex parte Jackson, 96 U.S. 727 ( 1877); Pitts, 332 F.3d at 453.   Thus, a sender or addressee of mail has a reasonable expectation of privacy in that mail.  See United States v. Villarreal, 963 F.2d 770, 774 (5th Cir. 1992); Koenig, 856 F.2d at 846.

In Koenig, cited by defendant Graham-Hayes, the court addressed the issue of whether a defendant had a reasonable expectation of privacy so as to be able to challenge the search and seizure of a package in transit when the moving defendant was neither the sender nor the addressee of the package.  In that case, a suspicious package was opened by Federal Express and found to contain cocaine.  The address given by the shipper was fictitious and the package was addressed to Lacey Lee Koenig.  In upholding the denial of the motion to suppress filed by co-defendant Lee Graf, the court found that he had no standing to seek suppression since he was neither the sender nor the addressee of the package.  856 F.2d at 846.

The court in Koenig did not adopt a bright line test limiting Fourth Amendment challenges strictly to the sender or addressee of a package when the package is searched or seized while in transit.  Rather, given the circumstances, the court stated that it need not decide whether a privacy interest could be recognized if a defendant presented "proof of an ownership interest in the contents of the package and a showing of the ability to control the package once delivered."  Id.  The court recognized that, for example, a wife might have a privacy interest in an envelope containing an insurance policy covering both her and her husband that was sent to the home addressed only to the husband.  However, the court found

that defendant Graf failed to establish even a limited privacy interest in the package and failed to point to any other source of a personal privacy interest in defendant Koenig's mail.

In this case, defendant Graham Hayes argues, in essence, that because cards containing her photograph were found in the package, she has standing to seek suppression of the evidence. The court's decision in <u>Koenig</u> is not helpful to her position. Rather, like defendant Graf, defendant Graham Hayes was neither the sender or addressee of the package. Moreover, like defendant Graf, defendant Graham Hayes does not claim any ownership interest in the package or its contents, nor has she shown that she had the ability to control the package once it was delivered. Defendant Graham-Hayes has not attempted to prove any privacy interest in the package.

Accordingly, <u>Koenig</u> compels the court's conclusion in this case that defendant Graham Hayes lacks standing to seek suppression of the package sent via the United States mail. Therefore, her motion to suppress the search of the California home on March 12, 2003, based upon the alleged defects in, and allegedly illegally obtained evidence supporting, the search warrant should be denied.

### <u>MOTION TO SUPPRESS – 4947 N. 47TH STREET</u>

It is well-established that a police officer with an arrest warrant can enter a suspect's residence to execute the warrant if there is reason to believe he will be found there; the officer does not need a search warrant. <u>Payton v. New York</u>, 445 U.S. 573, 603 (1980); <u>United States v. Pallais</u>, 921 F.2d 684, 690 (7th Cir. 1990). Therefore, law enforcement officers armed with an arrest warrant may enter a residence if they can demonstrate a reasonable belief that the person named in the warrant: 1) lives in the dwelling being searched; and, 2) that the person will be in the residence at the time of entry. <u>Payton</u>, 445 U.S. at 608.

Furthermore, police armed with an arrest warrant can search the entire residence of the person named in the warrant in order to execute it. See Pallais, 921 F.2d at 691.

In this case, an arrest warrant was issued for defendant Hayes for an alleged probation violation. Deputy United States Marshal Douglas Bachert began to work on the case as part of his duties with the Fugitive Drug Task Force. As part of his investigation, he obtained a copy of a Personal History of Absconder Form involving defendant Hayes. This form, which is completed by the United States Probation Office, provides information about an absconder, including last known address, associates, relevant telephone numbers and charges. Based on his review of the form and his conversation with the probation officer involved in the case, Deputy Bachert was aware that the defendant's address was 4947 N. 47th Street, apartment 2, in Milwaukee and that the defendant had no car and was unemployed. The probation officer also advised Deputy Bachert that defendant-Hayes would most likely be at the residence. Deputy Bachert thought that defendant Hayes had not left Milwaukee since he lacked money, employment and was possibly drug dependent.

On the morning of May 29, 2002, Deputy Bachert went to defendant Hayes' residence to execute the warrant. Based on the information he had obtained, Deputy Bachert expected defendant-Hayes to be at the residence. When no one responded to his knock on the door to apartment #2, he spoke to Willie Page, the caretaker of the building, who lived in apartment #1, and told him about the warrant. Mr. Page did not recall seeing the defendant that day, but he confirmed that defendant Hayes did not own a vehicle and that he was the husband of defendant Carol Graham-Hayes who also lived in apartment #2. Mr. Page stated that he had seen defendant Hayes the previous week and that he had seen him at the apartment numerous times over the prior several months. Mr. Page also said that defendant Hayes came and went at odd hours.

Deputy Bachert asked Mr. Page for a key to the apartment or he would have to break down the door. Mr. Page got the key to apartment #2 and gave it to Deputy Bachert. Deputy Bachert went inside the residence in an attempt to locate defendant Hayes. He looked anywhere a body could be found, including in the closets and under the bed. Deputy Bachert did not open any drawers or file cabinets. While in the apartment, Deputy Bachert observed several identification cards and some papers with names and social security numbers on a table next to a computer. Deputy Bachert did not inspect or manipulate the items. He was in the residence about five to ten minutes.

On July 9, 2002, Deputy Bachert obtained a search warrant for 4947 N. 47th Street, apartment #2. According to Deputy Bachert, the search warrant was obtained to assist him in locating defendant Hayes, not to investigate criminal activity. The search warrant was executed on July 10, 2003, and false identification cards and apparently fraudulent documents similar to those Deputy Bachert had seen on May 29, 2002, were recovered.

Defendant Hayes asserts in his post-hearing brief that he never went back to his apartment for any reason once he left the apartment on March 30, 2002. However, this information was not presented to the court during the hearing. Regardless, based on the information he had obtained from the absconder status form, Probation Officer Rex Morgan and Mr. Page, Deputy Bachert had a reasonable basis to conclude that defendant Hayes would be at his residence.

Deputy Bachert had a warrant for defendant Hayes' arrest and it was reasonable for him to believe that defendant Hayes had not left the jurisdiction and would be at his home on May 29, 2002, based on the information obtained during his investigation. Thus, Deputy Bachert could properly enter defendant Hayes' residence in an attempt to locate him. <u>See</u>

<u>Payton</u>, 445 U.S. at 603.  There is no evidence that Deputy Bachert exceeded the scope of a search to locate defendant Hayes based on the arrest warrant.

Accordingly, the court concludes that the May 29, 2002, search based on the arrest warrant for the defendant is not subject to suppression.  The items Deputy Bachert observed in plain view during this search provided a basis for the issuance of the search warrant executed on July 10, 2002.  The search warrant was part of the fugitive investigation and was obtained to get documents to find out where defendant Hayes was.  Thus, the evidence obtained from the July 10, 2002, search was properly obtained and need not be suppressed.

In light of the foregoing, the court will recommend that defendant Graham-Hayes' motion to suppress the evidence be denied.  The court will also recommend that the portion of defendant Hayes' motion challenging the Milwaukee search likewise be denied.

## MOTION TO SUPPRESS - CALIFORNIA RESIDENCE

Defendant Hayes also seeks suppression of evidence obtained from the search of the residence at 3864 Courtland Street in Lynwood, California on the ground that "factual issues remain as to what was found by federal postal employees when they claim an envelope sent by U.S. mail came open at the post office facility and what further steps were taken regarding contents of the envelope which did not fall out of the envelope." (Defendant Hayes' Motion to Suppress at 2 [Docket #72]).[1]  In his-post hearing briefs, he points out inconsistencies in the statements of the witnesses, particularly Mr. Simpkins' statement that he discovered the opened package at about 6:30 p.m. on March 10, 2003, and the testimony of Inspector Lenard that she received the call from Inspector Tiller to retrieve the opened package before

---

[1] In light of defendant Hayes' characterization of this motion, the evidentiary hearing focused on the events at the United States Postal Service facility which provided a basis for the search of the Lynwood, California residence.

5:00 p.m. that same day. Inspector Tiller said he made the call sometime before 6:00 p.m. Defendant Hayes maintains that the envelope was illegally searched and that the plain view doctrine is not applicable, citing Collins v. Wolff, 337 F. Supp 114 (D. Neb. 1972), aff'd. 467 F.2d 359 (8th Cir. 1972).

Defendant Graham-Hayes also filed a post-hearing brief on the California search. She maintains that the discovery of the items in her home in Lynwood, California was not inevitable. She also maintains that when mail in broken open while in the custody of the Postal Service, the contents which are thereby revealed are not subject to the plain view doctrine. She also cites Collins, 377 F. Supp. 114 and People v. Moraitis, 63 Misc.2d 344, 312 N.Y.S.2d 175 (N.Y.Co.Ct., 1970), to support her position.

The court has determined that defendant Graham-Hayes does not have standing to challenge the search of the California residence. Nonetheless, assuming arguendo, that she does have standing to challenge the search, the court will consider her arguments.

Before addressing the suppression issue with respect to the Lynwood, California search, the court notes that both defendants challenge the search and seizure of the computer in their post-hearing briefs. Defendant Graham-Hayes asserts that the anticipatory search warrant did not list a computer. She further asserts that although reference was made to a search warrant for the computer, such warrant had not been produced by the government. Defendant Hayes asserts that the computer was illegally seized and searched before April 11, 2003, without a warrant.

Two problems preclude suppression of the results of the computer search. First, neither defendant filed a motion to suppress the computer search, nor addressed the issue in their initial briefs. Therefore, the government had no opportunity to respond and the issue was not addressed at the evidentiary hearing. Second, Postal Inspector Lenard testified that

- 21 -

the computer was observed during the search of the California residence and seized as evidence of a crime. The evidence established that the computer was not searched until a search warrant was obtained. Defendant Hayes presents no evidence to support his assertion that the computer was searched without a warrant.

The defendants assert that the plain view doctrine cannot be applied to mail in custody of the United States Postal Service. In Collins v. Wolff, 337 F. Supp. 114 (D. Neb. 1972), a habeas corpus proceeding, the district court determined that because the mail at issue was first class mail, it was not subject to any opening and inspection by the post office without a search warrant. The court stated that he could not see how the plain view doctrine would apply to mail in the custody of the post office department because if the package was broken, it was the fault of the postal department. Id. at 117. Collins, however, is not controlling authority for this court. Moreover, based on the testimony in this case, it is reasonable to conclude that the package opened because it was "crammed with documents" and unbalanced.

In United States v. Allman, 336 F.3d 555 (7th Cir. 2003), an employee in the United States Postal Service's airmail center noticed a package from which protruded an object that the employee recognized as a "pivot pin" of an M-16 rifle. The employee, an army veteran, had become intimately acquainted with the M-16 rifle during his military service. The pivot pin connects the lower to the upper part of the rifle and is prominent when the weapon is disassembled. The employee squeezed the package and felt the outline of the lower part of the gun. He also noticed another package with the same address and the same handwriting and notified a postal inspector.

In upholding the denial of the defendant's motion to suppress, the court stated: The pivot pin was in plain view and created probable cause to believe that [the defendant] was

violating federal firearms laws." Id. at 556. Thus, the court of appeals for this circuit clearly recognized that the "plain view" doctrine is applicable to mail inadvertently opened in transit. Accordingly, the court will address whether the items observed by postal service employees were in "plain view."

It is well-established that under certain circumstances law enforcement officers may seize evidence in plain view. Horton v. California, 496 U.S. 128,134 (1990). However, in order to conduct a warrantless seizure of incriminating evidence, three conditions must be met: 1) the officer has not violated the Fourth Amendment in arriving at the place from which the evidence could be plainly viewed; 2) the incriminating character must also be "immediately apparent"; and 3) the officer must also have a lawful right of access to the object itself. Id. at 136-37.

The court of appeals for this circuit has stated that the requirement that the object's incriminating nature be "immediately apparent" is met where a law enforcement officer, upon seeing the object, has probable cause to believe that the object is contraband or evidence of a crime. United States v. Berkowitz, 927 F.2d 1376, 1389 (7th Cir. 1991)(citing Arizona v. Hicks, 480 U. S. 321, 327 [1987]). If, however,"the police lack probable cause to believe an object in plain view is contraband without conducting some further search of the object - i.e. if 'its incriminating character [is not] immediately apparent' [citation omitted] - the plain view doctrine cannot justify its seizure." Minnesota v. Dickerson, 508 U.S. 366, 375 (1993); see also, United States v. Brown, 79 F.3d 1499, 1508 (7th Cir. 1996). The government must establish probable cause for a seizure to invoke the "plain view" doctrine. Arizona v. Hicks, 480 U.S. 321, 326 (1987); see also, United States v. Cooper, 19 F.3d 1154, 1163 (7th Cir. 1994).

In this case, the evidence establishes that the postal employees at the Marina Processing and Distribution Center and Inspector Lenard, were lawfully in the place from which the documents could be plainly seen and that the incriminating nature of the documents was immediately apparent. While Mr. Simpkins was performing his duties as a parcel postal clerk processing priority mail, he observed a package at the top of his conveyer belt which was not in the red, white and blue priority mail package. When the package dropped to the next conveyor belt, he noticed that the one-half of the top portion of the package had come open and three cards came out. Two of the cards were facing up and he noticed that they were social security cards which had no numbers. The third card, also a social security card, was under the package.

It was the policy at the distribution center for employees to attempt to repair any opened package so it could be mailed to the recipient in a timely manner. As he attempted to place the social security cards inside the package, Mr. Simpkins noticed that neither address on the package was the Social Security Administration. He further observed that the postage was not the right postage for priority mail and that the stamps on the package were not cancelled. Mr. Simpkins also saw a sheet of paper with numbers on it and two identification cards that were partially out of the package. Mr. Simpkins testified unequivocally that he did not look inside the package. His suspicion was aroused by the blank social security cards and the identification cards which had the photographs of the same woman but with different addresses. He thought the numbers on the paper could be social security numbers, especially given that the social security cards were blank.

Mr. Simpkins had recently attended a safety talk on identity theft. Based on his observations and concerns, he realized that the package could involve identity theft. Mr.

- 24 -

Simpkins then took the envelope to his supervisor and said: "[Y]ou need to call the postal inspector, this is identity theft." (Tr. 66).

Mr. Simpkins was a very credible witness. As a 26 year veteran of the Postal Service, he clearly took his job seriously and appeared to be very conscientious about his work. There is no reason to believe. contrary to defendant Hayes' contentions, that Mr. Simpkins opened the envelope, either inadvertently or purposefully. The photographs of his work area support his testimony as to how the priority mail packages travel by conveyor belt and show the packages dropping from one belt to a lower one. The record is also devoid of any evidence that Mr. Simpkins manipulated the package so he could observe the contents. Based on the evidence presented, the court concludes that the package at issue was not opened by Mr. Simpkins. Thus, the three social security cards, the 8½" by 11" sheet of paper with numbers on it and the two cards with the photograph of defendant Graham-Hayes were plainly visible when first observed by Mr. Simpkins.

Mr. Smith also observed a portion of the sheet of paper with numbers on it and one or two social security cards when Mr. Simpkins placed the package on his desk. These documents were plainly visible. Mr. Smith testified that he did not look inside the package. He called Postal Inspector Tiller and reported the open package and the partial contents which were observed.

When Postal Inspector Lenard picked up the package from the Marina Processing and Distribution Center, she already had been advised that social security cards had fallen out of the package and that a sheet of paper with what appeared to be credit card numbers, as well as identification cards with the photographs of the same woman, but with different addresses, were observed coming out of the package. She personally observed the white sheet of paper with handwritten numbers on it when she picked up the package. Based on her training and

- 25 -

expertise as a member of the Postal Services's Economic Crimes Team, she immediately recognized the numbers as credit card numbers. She made these observations before she opened the package to photocopy the contents. Thus, the incriminating nature of the documents was immediately apparent to Inspector Lenard.

Defendant Hayes accurately notes that there is a discrepancy in the witnesses' testimony about when Mr. Simpkins reported the finding of the package to Mr. Smith and when the postal inspectors were notified. Mr. Simpkins also testified that he gave the package to his supervisor, Albert Winbush, but Mr. Smith testified that he received the package from Mr. Simpkins. According to Mr. Simpkins, he observed the package at about 6:30 p.m. on March 10, 2003, and he then reported it to his supervisor. However, Postal Inspector Tiller said he contacted Inspector Lenard sometime before 6:00 p.m. that day, although he did not remember the specific time. Inspector Lenard also could not recall the exact time that she received the call. However, she said that it was before 5:00 p.m. Mr. Smith testified that he initially thought that a temporary employee had found the package. In fact, in December 2004, Mr. Smith told defendant Hayes' counsel at the time that a temporary helper had found the package.

These discrepancies cannot be definitively explained. However, Inspector Tiller and Inspector Lenard both testified that they did not recollect the exact times of these events. This is understandable given that the event in question occurred over two years ago. Although these discrepancies cause concern, the court does not find that these discrepancies call into question the overall testimony of the witnesses. The witnesses all agree that the package was open when they first observed it and that certain questionable documents could be seen protruding from the open package. Thus, with the exception of these two

discrepancies, the testimony of Mr. Simpkins, Mr. Smith and Inspectors Tiller and Lenard was consistent on material matters concerning the open package.

The court also concludes that Ms. Lenard had a lawful right to the package. Inspector Lenard, whose job responsibilities are to investigate identity theft, credit card fraud and bank fraud, obtained the suspicious package from the distribution center. The package had been placed in the mail stream and was being processed at the center. Ms. Lenard saw that the package was torn across the top and was crammed full of documents. When she picked up the bulging package, she saw a white sheet of paper with handwritten numbers which she immediately recognized as credit card numbers. Inspector Lenard also had previously been told that blank social security cards had fallen out of the package and that the postal clerk had seen a paper with numbers and two identification cards with photographs of the same woman, but with different addresses, partially falling out of the package.

The documents Inspector Lenard personally observed partially coming out of the package, along with the observations and information from the other postal service employees, provided probable cause for Ms. Leonard to conclude that the items were evidence of a crime. The documents observed in plain view provided a basis for issuance of the anticipatory search warrant for 3864 Courtland Street in Lynwood, California. Given the court's conclusion that the certain documents in the package were in plain view, the court need not address defendant Graham-Hayes' argument that the inevitable discovery is inapplicable in this case. Therefore, based on the court's conclusion, even if defendant Graham-Hayes had standing to challenge the California search, her motion to suppress (Docket #78) should be denied. Defendant Hayes' motion to suppress should also be denied.

In sum, for the reasons stated herein, this court will recommend that defendant Hayes' motion to suppress (Docket #72) be denied. The court will also recommend that defendant

Graham-Hayes' motion to suppress the search of her Milwaukee home (Docket # 77) and the motion to suppress the California search (Docket #78) be denied.

## CONCLUSION

**NOW, THEREFORE, IT IS RECOMMENDED** that United States District Judge J.P. Stadtmueller enter an order denying defendant Elijah Hayes' motion to suppress. (Docket #72).

**IT IS FURTHER RECOMMENDED** that U.S. District Judge J.P. Stadtmueller enter an order denying defendant Carol Graham-Hayes motion to suppress the fruits of the search of her California home on March 12, 2003. (Docket #78).

**IT IS ALSO RECOMMENDED** that U.S. District Judge J.P. Stadtmueller enter an order denying defendant Carol Graham-Hayes' motion to suppress the fruit of the search of her Milwaukee home on July 10, 2002. (Docket #77.)

Your attention is directed to 28 U.S.C. § 636(b)(1)(B) and (C) and Local Rule 13.03 (E.D. Wis.), whereby written objections to the foregoing recommendation may be filed in duplicate with the Clerk of Court within ten days from the date of service of this recommendation. Failure to file a timely objection with the district court shall result in a waiver of your right to appeal.

Dated at Milwaukee, Wisconsin, this 21st day of June, 2005.

BY THE COURT:

s/ Patricia J. Gorence
PATRICIA J. GORENCE
United States Magistrate Judge